THOMAS GERAGHTY, Plaintiff-Appellant, v. CONTINENTAL WESTERN LIFE INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (3rd Division)  No. 1—95—2634

Opinion filed March 27, 1996.

Wahler, Pecyna & Fleming, of Chicago, for appellant.

Cassiday, Schade & Gloor, of Chicago (D. Patterson Gloor, Jennifer A. Keller, and Donald F. Ivansek, of counsel), for appellee Continental Western Life Insurance Company.

Richard M. Waris and William P. McGowen III, both of Pretzel &

Stouffer, Chartered, of Chicago (Robert Marc Chemers and Daniel G. Willis, of counsel), for appellees M.S. Linderman & Associates, Inc., and Michael Geraty.

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Thomas Geraghty and his now-deceased wife Noreen Geraghty applied for life insurance with defendant Continental Western Life Insurance Company (Continental). After Noreen's death, plaintiff requested the death benefit for which they had applied, *i.e.*, $250,000. Continental advised plaintiff that Noreen had been denied coverage due to preexisting medical conditions.

Plaintiff filed a complaint against the life insurance company (Continental), the insurance agent (Michael Geraty) and the agency employing the insurance agent (M.S. Linderman and Associates, Inc.). Plaintiff alleged that defendants negligently failed to take action on the life insurance application within a reasonable length of time and failed to give notice of the action taken, if any, on the application.

Plaintiff now appeals the trial court's entry of summary judgment in favor of all defendants and argues that a material question of fact exists regarding whether he was notified of defendant's decision to deny coverage to Noreen prior to her death.

We affirm.

On June 29, 1992, plaintiff and Noreen applied for life insurance with defendants. The defendant insurance agent, Michael Geraty (Michael), is plaintiff's nephew. In August 1992, Continental advised Michael by written memorandum and an amendment to the application that Noreen was excluded from the life insurance policy. On November 7, 1992, Noreen died.

About one year before applying for life insurance in June 1992, Noreen had been diagnosed with and extensively treated for a disease which essentially involves the destruction of red blood cells. From August 1991 until her death in November 1992, Noreen underwent several hospital admissions, numerous tests, an operation to remove her spleen, and virtually continuous monitoring of her blood.

On August 17, 1991, Noreen went to the emergency room at St. Francis Hospital with complaints of weakness for three days, anorexia for four days, nausea and sweating. In the emergency room, Noreen was diagnosed as suffering from severe anemia based on a blood test which showed Noreen's hemoglobin level at 5.4 in contrast to a normal hemoglobin level of 12 to 14. Noreen was admitted to the hospital from the emergency room on August 17 and remained as an inpatient until August 27, 1991.

During her hospitalization in St. Francis, Noreen was examined by Dr. Thomas Gynn, a hematologist and an oncologist, who ordered numerous tests, including a bone marrow biopsy, and who diagnosed a cold autoagglutinin disease, which affects the red blood cells. Six hours after admission, Noreen's hemoglobin level dropped to 4.6, which can be fatal. Noreen was given a blood transfusion and other medications. In addition, Noreen underwent a plasmapheresis, a procedure where plasma is taken out of the patient and normal plasma is infused into the patient, replacing half of the blood volume with normal plasma. Noreen's condition indicated that she may have had an underlying disease like lymphoma and thus surgery, *i.e.,* a staging laparotomy, was recommended. In a staging laparotomy, the patient's spleen, a portion of the liver and any lymph nodes which can be obtained are removed to determine the existence of lymphoma.

Dr. Gynn informed Noreen of her condition and further explained it "in great detail on multiple occasions" to Noreen's two daughters, Denise and Sandra, who were nurses at the hospital. In addition, Dr. Cliff Ireland, who had treated Noreen prior to August 1991 and was listed as her attending physician when she came to the emergency room, discussed Noreen's condition with her husband and with Noreen's daughters.

On September 3, 1991, Noreen was again admitted to St. Francis Hospital. On September 5, 1991, Noreen had a splenectomy in which her spleen was removed and lymph nodes were biopsied. The biopsy revealed no evidence of lymphoma. The underlying cause of Noreen's disease was not determined during her treatment at St. Francis. Dr. Gynn testified that for a person of Noreen's age (43) and gender, the disease was "aggressive" and "potentially fatal."

On September 23, 1991, Noreen was again admitted to St. Francis Hospital for severe anemia and with complaints of weakness, fever and headache. Dr. Gynn's notes written in the hospital chart for this admission state:

> "43-year-old female with relapse of cold agglutinin disease. *** It has been explained to the patient and family that this is a serious disease, that there is no cure and that a lymphoma may underlie the disease. *** Patient and daughter understand that this is a potentially fatal disease."

Dr. Gynn's notes further state, and Dr. Ireland's testimony concurs, that Noreen wanted to get a second opinion at Northwestern Hospital. Noreen transferred to Northwestern and neither Dr. Gynn nor Dr. Ireland saw her as a patient again.

Dr. Ireland testified that he spoke with plaintiff about Noreen's disease on at least two occasions, *i.e.,* during the August hospitaliza-

tion and in September regarding Noreen's transfer to Northwestern. In addition, Dr. Ireland spoke to plaintiff on the telephone. Noreen and her family were told that the underlying reason for her cold agglutinin disease could be cancer.

Dr. Gynn testified that he explained to Noreen that she was suffering from a relatively rare disease and recalled explaining Noreen's condition to her daughters "multiple times."

On September 24, 1991, Noreen was admitted to Northwestern Hospital with the previous diagnosis of autoimmune hemolytic anemia and cold agglutinin disease. Upon her admission, Dr. Leo Gordon, a hematologist and oncologist, agreed with the diagnosis presented from St. Francis. Dr. Gordon testified that although hemolytic anemia theoretically could be fatal, he viewed it as a serious, chronic disorder. Dr. Gordon further testified that it is unusual to have both disorders together.

Following her initial admission into Northwestern Hospital in September 1991, Dr. Gordon treated Noreen on an outpatient basis from October 1991 until her death on November 7, 1992. Dr. Gordon treated Noreen by testing her blood counts on a weekly basis, prescribing prednisone (a steroid) and seeing her as an outpatient on a monthly basis.

On November 6, 1992, Noreen was hospitalized for shortness of breath, chest tightness and low hemoglobin level and died in the hospital the following day. Although he did not attend to Noreen when she was admitted to the hospital on November 6, Dr. Gordon testified that the cause of Noreen's death was reported as "respiratory failure likely related to an overwhelming infection."

Dr. Gordon testified that Noreen's condition never changed during the time he saw her and she was never cured of her hemolytic anemia. Dr. Gordon did not believe he ever told Noreen or anyone in her family that her condition had been cured. Due to her disease, Noreen would have had to monitor her blood for the rest of her life. Dr. Gordon did not think Noreen thought of her condition as life-threatening but realized it was a serious condition. Dr. Gordon recalled discussing the seriousness of Noreen's condition with her daughters and her husband.

Dr. Gordon testified that the diagnosis of Noreen never changed. Moreover, Dr. Gordon, like the doctors at St. Francis Hospital, never found the underlying cause for the hemolytic anemia.

On June 29, 1992, with this medical background, Noreen and plaintiff began the application process for a life insurance policy in the amount of $250,000 for each person through Michael. The application required the proposed insureds to provide certain informa-

tion concerning their medical histories. Plaintiff and Noreen answered "no" to inquiries which asked whether the person to be insured:

"(b) Had an electrocardiogram, x-ray, blood study, or other special diagnostic test within last 5 years?

\* \* \*

(d) Ever been a patient (within the last 5 years) in any hospital, institution or sanatorium for any reason not already mentioned?"

Plaintiff and Noreen answered "yes" to the question which asked whether the person to be insured had "[c]onsulted with a doctor within the last five years or currently have an injury or illness?" An affirmative response to this question required the applicant to provide further details in the application, *i.e.*, "person involved, disorder, date, duration, and names, addresses and phone numbers of physicians and hospitals." The portion of the application for such details was left blank.

The application also included a 60-day conditional receipt which stated in relevant part as follows:

"[I]t is expressly understood that the Company will not be on the risk unless the proposed insured(s) is determined within 60 days of the date of the application to be a risk acceptable for the standard insurance exactly as applied for without modification of plan, premium rate, or amount under the Company's rules and practices."

By letter dated July 2, 1992, Continental notified plaintiff that it received the life insurance application and an initial $1,000 premium payment. The letter further advised:

"We are currently processing your application and hope to have it approved shortly. If, for any reason, your application cannot be approved, we will let you know as soon as possible."

Also on July 2, 1992, Michael received a memo from Continental requesting that both plaintiff and Noreen have a medical examination and blood work.

On July 13, 1992, a second part of the insurance application was prepared at plaintiff's home by a medical examiner (Marilyn Paolello) from Mobile Insurance Exams, Inc., following her examination of the proposed insureds. The application reveals that Noreen responded "no" as to whether she has or ever had "any disorder of the blood." Contrary to her response made in June 1992 in part one of the application, Noreen now responded "yes" as to whether she ever had an X ray or blood study in the last five years and whether she had ever been observed or treated in any hospital. In addition, Noreen responded "yes" as to whether she had "[a]ny other ailment,

injury, treatment, or operation within the last 5 years." Noreen explained her affirmative answers by noting that she had "surgery regarding spleen at St. Francis."

The application also contained other erroneous information. Plaintiff incorrectly stated that he was a United States citizen and that he was not related to Michael, who in fact was his nephew.

Following the completion of part two of the application, Continental made three requests for medical records from St. Francis Hospital but no information was forwarded. St. Francis returned Continental's request form and noted "8/18 chart missing T/S unknown."

By memorandum dated August 20, 1992, a senior underwriting analyst (Carole Lynch) from Continental informed Michael Geraty as follows:

"To date we have not received medical records form [sic] St. Francis Hospital regarding Noreen Geraghty, therefore we are removing her from the policy. We will be happy to reconsider upon receipt of complete name and address of physician who has all medical records including hospital records or if we can obtain hospital records direct."

On August 21, 1992, Continental mailed to Michael an "AMENDMENT TO APPLICATION" which expressly excluded Noreen from coverage. In addition, Continental sent a document entitled "DELIVERY INSTRUCTION SHEET" which also advised that Noreen was excluded from coverage:

"Noreen deleted as we have been unable to obtain hospital records. Will reconsider upon receipt of said records."

Michael testified that he received both documents (the amendment to application and the delivery instruction sheet) at the end of August. Michael requested and Continental agreed to reconsider upon obtaining the missing medical records. Michael went out of his way to obtain the records and over a period of time Continental received them.

Michael testified that he told plaintiff, Noreen and their daughter Denise about Noreen's exclusion from the policy. As to plaintiff, Michael testified that he called and spoke to plaintiff about the amendment and plaintiff "would not sign the amendment." Michael further testified that he had three conversations with plaintiff in which he refused to sign the amendment to the application.

As to Noreen, Michael testified that on August 28, 1992, he spoke to Noreen and told her that she was excluded from the policy.

As to Denise, Michael testified that he told Denise in the beginning of September that Noreen was not covered under the insurance policy. Michael talked to Denise on the telephone on two or three occasions "looking for Noreen or Thomas Geraghty."

Plaintiff testified that he lives in a two-flat building. His daughter Denise lives with plaintiff in the downstairs unit and his other daughter Sandra, who is married, lives in the upstairs unit.

Plaintiff testified that he did not speak to Michael about his life insurance application at any time between July 13, 1992, and the time of his wife's death (November 1992). Plaintiff acknowledged that Noreen spoke to Michael about the life insurance and that Michael said he was having problems with medical records but everything would be okay. Noreen had at least two telephone conversations with Michael in August 1992 and knew that the insurance company was having difficulty obtaining medical records.

Plaintiff testified that he did not receive any other correspondence from Continental except the letter dated July 2, 1992, which advised him that the application had been received and was being processed. According to plaintiff, neither he nor Noreen ever received any correspondence from Michael or anyone at M.S. Linderman regarding the life insurance application.

Plaintiff talked to his daughters about Noreen's condition and testified that his daughters said Noreen was fine. Plaintiff testified that neither his daughters nor a doctor ever explained to him what type of anemia Noreen had. Plaintiff also testified that his daughters, who were medically trained nurses, did not interpret Noreen's medical condition for plaintiff and they did not explain it to him because he would not have understood. No one related to plaintiff that Noreen had a possibly fatal condition.

Following Noreen's death on November 7, 1992, plaintiff made a demand for the life insurance proceeds. By letter dated December 11, 1992, Continental denied his claim and summarized his application process, explaining that in August 1992, Noreen had been excluded from coverage due to her preexisting medical history.

In February 1993, plaintiff filed a complaint alleging that the named defendants negligently failed to take action on the application within a reasonable length of time and failed to give notice to plaintiff or Noreen about the action taken on the application until after Noreen died.

In response, Continental filed a motion for summary judgment and attached an affidavit of Mark Snider, director of underwriting and policy issue at Continental. Snider attested that Continental would not have issued life insurance to Noreen "due to her medical history, including her diagnosis of hemolytic anemia," because her diagnosis "made her an unacceptable risk for life insurance."

On April 28, 1995, the trial court granted summary judgment in favor of Continental and stated in its order that the cause of action

remained against Michael and M.S. Linderman. Thereafter, on June 30, 1995, the trial court denied plaintiff's motion for reconsideration, sustained its order granting summary judgment in favor of Continental and also granted summary judgment on behalf of M.S. Linderman and Michael upon their oral motion.

On appeal plaintiff asserts that summary judgment should not have been granted because genuine issues of material facts and inferences exist regarding what actual information was given to plaintiff and Noreen about her deletion from coverage. Plaintiff submits that disputes exist as to whether plaintiff was notified based on the following: (1) in their respective depositions, Michael testified that he notified plaintiff verbally about Noreen's exclusion from coverage while plaintiff testified that he did not have any such conversations with Michael; (2) Michael testified that he told Denise about Noreen's exclusion while Denise denied the conversation in an affidavit; (3) the subject matter of the conversation between Michael and Noreen after Continental excluded Noreen from coverage is in dispute because Michael claims that he told Noreen about her exclusion while plaintiff testified that Michael only told Noreen that there was a problem obtaining medical records; (4) Dr. Gynn's testimony that he advised Noreen and her daughters that Noreen had a potentially fatal disease does not allow the inference that plaintiff had been advised that Noreen had been deleted from the policy; and (5) Continental had no contact, verbal or by mail, with plaintiff from July 2, 1992, until Noreen's death.

Continental contends that summary judgment was proper because (1) plaintiff failed to establish the required damages element of his negligence cause of action; (2) the delay, if any, in processing the application was caused by plaintiff's material misrepresentations and omissions on the application; and (3) plaintiff cannot show that he was reasonably lulled into a sense of security by thinking Noreen was covered under a policy for life insurance.

M.S. Linderman and Michael assert that they were entitled to summary judgment as a matter of law because Noreen was uninsurable and plaintiff received prompt notice. Like Continental, these two defendants also argue that the misrepresentations and omissions on the application led to any delay that occurred and obviated the need for notice that Noreen would not be insured under the policy.

Summary judgment is proper when the pleadings, depositions and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1992). We apply a *de novo* standard of review to summary judgment orders.

*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

Plaintiff specifically relies on the decision in *Talbot v. Country Life Insurance Co.*, 8 Ill. App. 3d 1062, 291 N.E.2d 830 (1973), which found that an insurer may be liable in tort, as opposed to contract, for damage resulting from unreasonable delay in passing on an insurance application. In acknowledging a cause of action premised on negligence, the *Talbot* court relied on the following principle:

> " '[A]n insurance company obtaining an application for insurance is under a duty to accept it or reject it within a reasonable time.' " *Talbot*, 8 Ill. App. 3d at 1064-65, quoting 12 J. Appleman, Insurance Law & Practice § 7226 (1943) (now 12A J. Appleman & J. Appleman, Insurance Law & Practice § 7217 (1981)).

After recognizing a duty on the part of the insurance company, the *Talbot* court further espoused

> " 'that where [an] application was made for a life policy with a beneficiary being designated to receive the proceeds, a cause of action lodges in such beneficiary, upon the applicant's death, for unreasonable delay on the part of the insurer, in accepting or rejecting such application.' " *Talbot*, 8 Ill. App. 3d at 1065, quoting 12 J. Appleman, Insurance Law & Practice § 7232 (1943) (now 12A J. Appleman & J. Appleman, Insurance Law & Practice § 7222 (1981)).

Similarly, the *Talbot* court found that an insurance agent may "be liable for misfeasance if they unreasonably delay." *Talbot*, 8 Ill. App. 3d at 1065.

The rationale for liability based on negligence

> "is that the agent or company owes an applicant for insurance what amounts to a legal obligation to act with reasonable promptness on the application, either by providing the desirable coverage or by notifying the applicant of the rejection of the risk so that he may not be lulled into a feeling of security or put to prejudicial delay in seeking protection elsewhere." *Talbot*, 8 Ill. App. 3d at 1065.

It is well established that the elements of a negligence action are a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach of duty and damages. *E.g., Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95, 652 N.E.2d 267 (1995).

In accordance with the elements of a negligence action, Appleman states:

> "Even if an action of tort may be maintained against an insurer for neglect in failing to act on an application for a life policy, the plaintiff must establish *damage* by showing either that other in-

surance could have been secured or that the applicant was an insurable risk of such character that other insurers would be likely to have accepted the risk." 12A J. Appleman & J. Appleman, Insurance Law & Practice § 7218 (1981).

Courts which have recognized a cause of action for negligent delay in processing an insurance application require the plaintiff to prove "that the insurance applied for could have been secured or that the insurance could have been secured elsewhere." *Huff v. Standard Life Insurance Co.*, 897 F.2d 1072, 1074 (11th Cir. 1990) (and cases cited therein); see also *Thomas v. Life Insurance Co.*, 219 La. 1099, 1106, 55 So.2d 705, 707 (1951); *Smither v. United Benefit Life Insurance Co.*, 164 Kan. 447, 456, 190 P.2d 183, 189 (1948).

In affirming summary judgment in favor of the insurers, the tenth circuit held that damage is a required element in a tort action and in the context of the same cause of action as the present case, found that

"by advancing this tort claim of negligent delay in accepting or denying the application, [the plaintiff] also bears the burden of demonstrating damage before [the plaintiff] will be allowed to recover." *Wilson v. Massachusetts Indemnity & Life Insurance Co.*, 920 F.2d 1548, 1553 (10th Cir. 1990).

■ In the present case, plaintiff failed to plead or produce any evidence that Noreen was insurable by Continental or any other insurer. "If from the papers on file, a plaintiff fails to establish an element of his cause of action, summary judgment *** is proper." *Gauthier v. Westfall*, 266 Ill. App. 3d 213, 220, 639 N.E.2d 994 (1994). Even though a plaintiff need not prove his case at the summary judgment stage, a plaintiff must present some evidentiary facts to support the elements of his cause of action. *Barker v. Eagle Food Centers, Inc.*, 261 Ill. App. 3d 1068, 1071, 634 N.E.2d 1276 (1994); *Brooks v. Brennan*, 255 Ill. App. 3d 260, 262, 625 N.E.2d 1188 (1994) ("[w]hen a defendant files a motion for summary judgment, as in this case, the plaintiff must then come forward with evidence to support each and every element of its causes of action in order to avoid summary judgment"). Thus, absent some evidentiary facts proffered by plaintiff on the required element of damages, we find that summary judgment in favor of defendants was proper.

Moreover, we disagree with plaintiff concerning his assertion that he had any real expectations of acquiring life insurance coverage for Noreen. An underlying rationale in placing a duty on insurers to notify an applicant that he has been denied coverage is to prevent the applicant from being lulled into a false sense of security. In light of Noreen's serious, chronic and incurable preexisting medi-

cal condition and plaintiff's knowledge that the insurers had not accepted Noreen for coverage but rather, at the least, had delayed, if not denied, the application eliminates any expectation plaintiff held.

Plaintiff's expectation of coverage for Noreen was further weakened by the 60-day conditional receipt which expressly informed plaintiff that coverage was not granted unless he was notified within 60 days that the applicant was an acceptable risk.

For all the foregoing reasons, we affirm the trial court's order of summary judgment in favor of all defendants.

Affirmed.

TULLY and CERDA, JJ., concur.